**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 7 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FELIX CRESPIN,

      Plaintiff - Appellant,

v.

STATE OF NEW MEXICO; ELOY
MONDRAGON, Secretary of
Corrections for the State of New
Mexico; and ATTORNEY GENERAL
OF THE STATE OF NEW MEXICO,

      Defendants - Appellees.

No. 97-2046

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-94-367-LH)**

---

Judith A. Rosenstein, Assistant Federal Public Defender, Albuquerque, NM, for
the Plaintiff - Appellant.

Joel K. Jacobsen, Assistant Attorney General (Tom Udall, New Mexico Attorney
General, with him on the brief), Santa Fe, NM, for Defendants - Appellees.

---

Before **TACHA**, **HENRY** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case requires us to revisit the appropriate standard to be applied under the federal Confrontation Clause when determining the admissibility of a non-testifying accomplice's confession. We conclude that an incorrect standard was applied.

Felix Crespin is a prisoner in New Mexico state custody, convicted of armed robbery and related charges. He seeks habeas relief, contending that the admission at trial of the custodial confession of a non-testifying co-defendant violated his rights under the Confrontation Clause of the Sixth Amendment. The United States district court dismissed with prejudice Crespin's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. We agree with petitioner that admission of the confession amounted to constitutional error. Applying harmless error review, we deny habeas relief.

**I**

On June 5, 1990, Crespin and co-defendants Rebecca Miles and Albert Fuentes were charged with armed robbery, conspiracy to commit armed robbery, aggravated battery, and conspiracy to commit aggravated battery in connection with a hold-up and stabbing at an Allsup's convenience store in Albuquerque, New Mexico in the early morning hours of May 22, 1990. Crespin and Miles were also charged with evading an officer and Miles with tampering with evidence. Miles and Fuentes pled no contest to reduced charges. Miles was

sentenced to nine years in prison, six of which were suspended, and Fuentes to eighteen months, three of which were suspended.

At Crespin's trial, the prosecution called Miles to testify. Miles, who was represented by an attorney, declined to answer any questions about the robbery. Although the trial court ordered her to respond, and she was advised that she had no Fifth Amendment privileges as a result of her plea, she steadfastly refused to testify. The trial court held her in summary contempt.

The government then moved to admit into evidence Miles's out-of-court statement to the police. Asserting that Miles was an unavailable witness, the government contended that the statement, in which she confessed to the crime, qualified as a hearsay exception under New Mexico Rule of Evidence 11-804(B). The trial court granted the request, concluding that the statement contained sufficient indicia of reliability to satisfy Confrontation Clause concerns under both the New Mexico and United States Constitutions.

Police Officer Jeff House, who took Miles's confession the morning of May 25, 1990, was subsequently called to the stand. House testified that Miles offered the statement "openly and willingly," and no threats or promises were made in exchange. He then read an edited version of Miles's statement, in which she recounts that at about 1:30 a.m. on Tuesday, May 22, 1990, while she was buying a quart of whiskey, some friends of hers were approached by two men in a car.

As Miles approached the car, she saw "'a big old knife sticking out of both of their waists of their pants.'" Trial Tr. Vol. II at 155. After her friends left, the two men, whom Miles did not know, offered her a ride, and Miles, who was "'already buzzing by then,'" got into their car. Id. Her statement continues:

> "They drove around and wouldn't let me out. One of them said, 'I need some money.' And I didn't have any money to give them because I had just bought that booze.
>
> "I started drinking some more of the Jack Daniels because I was scared. They were acting all freakie . . . .
>
> "[W]e went into the Allsup's. They told me to run in. He told me to run in and do it. I told him I didn't want to do it, that I was scared. I had never done that before and I was all drunk already.
>
> "They put the knife in my hand by the door of the Allsup's. And I guess that's where I approached the clerk guy in the store. I don't remember stabbing him, but I remember seeing a lot of blood and . . . the other [guy] standing next to me telling me [to] open the cash register. He had a knife too.
>
> "I remember grabbing some ones from the cash register and slipping over a bunch of cigarettes and I guess his blood, too. We were running to the car. The other guy pushed me in the middle and took the knife from me. . . .
>
> "I was all scared and I didn't know what to do. We took off quick and went around the corner."

Id. at 155-56.

According to Miles's statement, as the three were fleeing in the car she spotted a police officer and tried futilely to get the others to stop. Eventually, she

- 4 -

kicked the driver and forced the car to stop. She was then grabbed by the male passenger who told her to run. Miles continues: "'I didn't to run [sic] because I was scared. I ran and crawled under a trailer . . . . I left the money there because I didn't want it. Then I climbed over a fence and that's when the police came up and arrested me.'" Id. at 157.

After Miles made her statement, Officer House asked her a number of questions. He read this question-and-answer exchange to the jury as well. In response to House's questions, Miles indicated that robbing the store was her accomplices' idea:

"QUESTION: Before you got to the Allsup's, did they discuss or tell you how they wanted you to do this robbery?

"ANSWER: They just said to run in and do it and that they would be behind me. And I said, 'Okay, but just don't get me in trouble.' I knew I was doing something wrong.

"QUESTION: Do you remember which one of the male subjects gave you the knife before you entered the Allsup's?

"ANSWER: The one with the tattoos, the one in the passenger side.

"QUESTION: Did the passenger go into the Allsup's with you?

"ANSWER: Yes."

Id. at 159-60.  Miles could remember few details about either the stabbing or the robbery:

> "QUESTION:     Do you remember stabbing the clerk at the Allsup's?
>
> "ANSWER:     If I did, I'm sorry.  I didn't mean to do that.  I don't remember anything about that.
>
> "QUESTION:     Do you remember saying anything to the clerk?
>
> "ANSWER:     No, I don't.
>
> "QUESTION:     Did the other subject who went into the Allsup's with you, the passenger with the tattoos, stab the clerk at any time?
>
> "ANSWER:     I don't know.
>
> "QUESTION:     Do you remember if the subject who went into the Allsup's with you said anything to the clerk?
>
> "ANSWER:     Yes.  He was telling the clerk to open the cash register."

Id. at 160-61.  Miles also suggested that she was intimidated because the two men had weapons:

> "QUESTION:     In your opening statement you stated the two male subjects showed you their knives.  Did you ever use these knives to -- did they ever use these [knives] to threaten you or force you to do anything you didn't want to do?

- 6 -

"ANSWER:      I thought that they were going to use the knives against me if I didn't do what they wanted me to do. I was scared. But they never actually threatened me with the knives.

"QUESTION:   Is there anything else you would like to add to your statement?

"ANSWER:      I'm sorry to the clerk. And I'll do anything to help pay him back. I never did this before. I didn't mean to hurt him. I was drunk to the point where I didn't know what I was doing. And it will never happen again, I promise you that."

Id. at 165. Miles stated that since the arrest she had seen the two men only in court. House then read a concluding clause, signed by Rebecca Miles, which attested to the statement's voluntariness and accuracy.

The only eyewitness to the robbery was store manager Dale Autry, the stabbing victim. Autry testified that two individuals, a male and a female, entered the store around 2:30 a.m. According to Autry, the woman asked him "[w]here is the money?," id. at 35, and, as he went to open the cash register, she stabbed him. During this time, "[t]he male was sitting there telling the girl to, 'Hurry up so we can get out of the store.'" Id. at 41. Autry also testified,

A.      . . . I told the male to tell her to back off because I wouldn't open [the register] with her stabbing on the register.

Q.      Okay. And what did he say?

> A. He told her to back off, "He'll give you the money," and stuff.
>
> Q. Okay. And did she back off?
>
> A. Yes.

Id. at 43. The clerk testified that both individuals exited the store together. On cross-examination, he agreed that the male did not have a knife and did not participate in the stabbing. He also testified that only the woman demanded and took money.

In court Autry readily identified Crespin as the male in the store. He admitted on cross-examination, however, that he had been unable to identify Crespin from a photo array three days after the crime, though he had picked out a photo of Miles as the female robber. Autry also admitted that, in response to a question from the police soon after the crime, he had stated that the male perpetrator did not have tattoos on his arms. It is undisputed that both Crespin and Fuentes have tattoos on their arms.

Crespin was arrested a short time after the crime, several blocks from the crime scene. The arresting officer, as well as other officers who participated in the arrest and booking, testified that there appeared to be blood on his shirt, jeans and arms. The clothing, with what appeared to be dried blood, was admitted into evidence, as were photos taken at the time of arrest of Crespin's hand and arms, which also appeared to have blood on them.

The jury was instructed that the defendant could be found guilty of the crimes charged either as a principal or as an accomplice. The accomplice instruction states:

> The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the state proves to your satisfaction beyond a reasonable doubt that:
>
> 1. The defendant intended that the crime be committed;
>
> 2. The crime was committed;
>
> 3. The defendant helped, encouraged or caused the crime to be committed.

R. Proper at 203.[1] After deliberating for about eight hours, the jury convicted Crespin on all counts.[2] Crespin was qualified as a second habitual offender and sentenced to 30 years in prison.

## II

### A

The Confrontation Clause of the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, see Pointer v. Texas, 380 U.S. 400,

---

[1] Prior to submitting the case to the jury, the court granted defendant a directed verdict dismissing the charge of evading a police officer for lack of evidence.

[2] On December 18, 1990, defendant moved for a retrial based on an alleged letter by Miles to Crespin asserting that Crespin had not been with her on the night of the robbery. At a hearing on this new evidence, Miles again refused to testify, invoking her Fifth Amendment privilege against self-incrimination. Lacking proper authentication, the new evidence was not admitted for its truth, and the motion for a new trial was denied.

403 (1965), provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This provision "reflects a preference for face-to-face confrontation at trial, and . . . 'a primary interest secured by [the Sixth Amendment] is the right of cross-examination.'" Ohio v. Roberts, 448 U.S. 56, 63 (1980) (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)). Accordingly, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Roberts, 448 U.S. at 65. The statement must also demonstrate sufficient "indicia of reliability" to justify admission. Id. at 65-66. Crespin does not dispute the declarant's unavailability; rather, he challenges the statement's reliability.

Confessions of accomplices or co-defendants are "presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." Lee v. Illinois, 476 U.S. 530, 545 (1986); see also New Mexico v. Earnest, 477 U.S. 648, 649 (1986) (Rehnquist, J., concurring) (noting state must overcome a "weighty presumption of unreliability" to sustain admission of statement). In order to rebut this presumption of unreliability and inadmissibility, New Mexico must demonstrate both that the statement contains "'particularized guarantees of

- 10 -

trustworthiness' . . . drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief," and that the statement is "so trustworthy that adversarial testing would add little to its reliability." Idaho v. Wright, 497 U.S. 805, 820-21 (1990). "[H]earsay evidence used to convict a defendant must possess indicia of reliability by virtue of [its] inherent trustworthiness, not by reference to other evidence at trial." Id. at 822. Custodial confessions "have traditionally been viewed with special suspicion." Earnest v. Dorsey, 87 F.3d 1123, 1131 (10th Cir.), cert. denied, 117 S. Ct. 527 (1996).

On direct appeal, the New Mexico Court of Appeals upheld Crespin's conviction, agreeing with the trial court that Miles's statement contained sufficient indicia of reliability to rebut Crespin's constitutional claims. State v. Crespin, No. 13,029, slip op. at 2-6 (N.M. Ct. App. Apr. 27, 1992), cert. denied, 113 N.M. 702 (1992). On habeas review, the federal district court dismissed Crespin's petition. Crespin v. New Mexico, Civ. No. 94-0367 (D.N.M. Jan. 6, 1997). In evaluating the reliability of the hearsay statements, we presume the factual findings of the New Mexico state court and the federal district court are correct unless clearly erroneous, see Brewer v. Reynolds, 51 F.3d 1519, 1522 (10th Cir. 1995); the overall determination of reliability is a mixed question of

- 11 -

law and fact reviewed de novo. See Earnest, 87 F.3d at 1131; Myatt v. Hannigan, 910 F.2d 680, 685 (10th Cir. 1990).

Relying on New Mexico state law's four-factor inquiry, the New Mexico Court of Appeals concluded that Miles's statement was reliable:

> The state can rebut the presumption that Miles' statement was unreliable by showing: (1) Miles was not offered leniency in exchange for her statement; (2) the statement was against Miles' penal interest; (3) Miles did not attempt to shift blame from herself to defendant; and (4) independent evidence was presented at trial which substantially corroborated Miles' statement.

Crespin, No. 13,029, slip op. at 3 (citing State v. Earnest, 744 P.2d 539 (N.M. 1987) and State v. Gallegos, 781 P.2d 783 (N.M. Ct. App. 1989)).[3]

In support of its first conclusion, the state court found that Miles was not offered leniency in exchange for her statement. Appellant presented no evidence contradicting Officer House's testimony or Miles's signed statement that compels a different conclusion. The relative leniency of Miles's sentence as contrasted

---

[3]     The federal district court found that the statement bore adequate indicia of reliability based on the first two factors:

> In reviewing Rebecca Miles' statement, there is nothing in it to indicate that the statement was involuntary, or that she was coerced or threatened. . . . As found by both the trial court and the New Mexico Court of Appeals, Miles admitted she was in the store with the knife, she took the money, and she knew what she did was wrong.

Magistrate Judge's Proposed Findings and Recommended Disposition at 12 (adopted by district court in Crespin v. New Mexico, Civ. No. 94-0367 (D.N.M. Jan. 6, 1997)).

with that of appellant is not persuasive evidence to the contrary. As the state court noted, "Miles was a first time offender while defendant had been convicted of prior offenses . . . [and] defendant was also offered a reduced maximum sentence during plea bargaining which . . . defendant refused." Crespin, No. 13,029, slip op. at 3.

Turning to the second factor, the state court concluded that Miles's statement was against her penal interest. The court set forth the correct legal standard, examining whether the statement "so far tends to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless she believed it to be true." Id. at 4; see Williamson v. United States, 512 U.S. 594, 603-04 (1994). The court emphasized Miles's awareness that the statement would lead to criminal liability: "[Miles] admitted that she was in the store with a knife and that she took money from the cash register. She knew her conduct was wrong. The trial court was not required to infer from these facts that Miles could not reasonably believe she would be prosecuted." Crespin, No. 13,029, slip op. at 4.

We accept the state court's finding that Miles subjected herself to some liability in portions of her statement. However, the state court relied on an erroneously limited view of the statement's overall effect on Miles's liability in concluding that the statement as a whole was against her penal interest. The court

only considered whether the statement subjected her to any liability and did not consider whether the statement as a whole significantly reduced the extent of that liability.

"[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context . . . [and] in light of all the surrounding circumstances." Williamson, 512 U.S. at 603; see also Earnest, 87 F.3d at 1134 (implying that statement against penal interest analysis would be improper if it "assumed that the entire narrative was reliable merely because some elements of it were self-inculpatory"). In her statement, Miles did not admit to committing the stabbing and claimed she could not remember anything about it; the clerk's testimony, however, indicates she was the stabber. Miles also claims that she did not remember demanding money of the store clerk and states that her companion told the clerk to open the cash register. Yet, according to the clerk's testimony, it was she, the female robber, who demanded money. She emphasized her drunken state and implied that her accomplices threatened her. Because Miles may reasonably have thought such a statement would decrease her practical exposure to criminal liability, the statement was not reliable as being against her penal interest. Cf. Williamson, 512 U.S. at 601 (stating that court "may not just assume . . . that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else"); id. at 604

- 14 -

(O'Connor, J., concurring) (holding that codefendant's statement was not properly admitted because "[a] reasonable person in [declarant's] position might even think that implicating someone else would decrease his practical exposure to criminal liability, at least as far as sentencing goes"); Earnest, 87 F.3d at 1134 (noting that proper analysis requires inquiry "into particularized guarantees of trustworthiness surrounding those portions of the statement incriminating [defendant], including the fact that the entire statement inculpated both [declarant and defendant] equally, rather than relying on mere proximity to statements inculpatory of [declarant]") (emphasis added).[4]

The appeals court also concluded, in support of the reliability of Miles's statement, that "the trial court could have inferred . . . that she attempted to spread responsibility for the crimes on all three participants rather than to shift

---

[4] According to the concurring opinion, our analysis improperly intrudes on the state court's role as finder of fact. However, in conducting the requisite de novo review of whether the admission of this statement violates the Confrontation Clause, we can take neither the statement itself nor the state court's "indicia of reliability" in isolation. Nor can we assume that the state court's legal analysis is correct merely because the state court has recited the proper legal test. We are charged with examining the statement in its entirety in the context of the trial record and "in light of all the surrounding circumstances," Williamson, 512 U.S. at 603, to determine whether the state court's application of the legal test — here, the state court's analysis of whether the statement is against Miles's penal interest — is constitutionally sound. We must review this legal analysis de novo. See, e.g., Earnest, 87 F.3d at 1131, 1133-34 (conducting de novo review of whether statement is against penal interest of declarant in order to evaluate its admissibility); cf. State v. Sanchez, 811 P.2d 92, 96 (N.M. Ct. App. 1991) ("[W]hether a statement bears sufficient indicia of reliability to permit its admission into evidence under Rule 11-804(B) is generally a question of law.")

- 15 -

blame from herself to the two men." Crespin, No. 13,029, slip op. at 5. The court

erred in this analysis as well. See Lee, 476 U.S. at 544 (stating that inquiry bears

on the "question of whether the confession was . . . free from any desire, motive,

or impulse [declarant] may have had either to mitigate the appearance of his own

culpability by spreading the blame or to overstate [defendant's] involvement").

Lee precludes the distinction between spreading and shifting blame upon which

the court of appeals predicated its opinion. Miles's statement dilutes her

involvement in both the stabbing and the robbery by leaving open the possibility

that an accomplice may have stabbed the victim and by explicitly asserting that it

was her accomplice who demanded money of the store clerk. By mitigating her

own responsibility for the crimes, the statement clearly entangles the

considerations of motive which guide our analysis under Lee.

Finally, the state court pointed to the existence of independent

corroborating evidence in support of admitting Miles's statement. That is

impermissible because,

> the use of corroborating evidence to support a hearsay statement's
> "particularized guarantees of trustworthiness" would permit
> admission of a presumptively unreliable statement by bootstrapping
> on the trustworthiness of other evidence at trial, a result we think at
> odds with the requirement that hearsay evidence admitted under the
> Confrontation Clause be so trustworthy that cross-examination of the
> declarant would be of marginal utility.

Wright, 497 U.S. at 822.[5] The prosecution's argument that consideration of this factor adds "another hurdle" for the prosecution and thus benefits the defendant is disingenuous at best. See Appellee's Br. at 22. Under the Confrontation Clause, use of corroborating evidence to bolster a statement's reliability impermissibly eases the prosecution's burden on the pertinent issue in the inquiry — the "inherent trustworthiness" of the statement itself. Wright, 497 U.S. at 822.

Because we find the lower courts did not, either explicitly or implicitly, correctly apply the "indicia of reliability" in analyzing Miles's statement, we conclude that "on the record before us, there is no occasion to depart from the time-honored teaching that a codefendant's confession inculpating the accused is inherently unreliable." Lee, 476 U.S. at 546. We hold that admission of the statement violated the Confrontation Clause of the Sixth Amendment.

**B**

But for harmless error review, this would conclude our opinion. Confrontation Clause violations, however, are constitutional trial errors subject to harmless error analysis. See Delaware v. Van Arnsdall, 475 U.S. 673, 684 (1986); United States v. Joe, 8 F.3d 1488, 1497 (10th Cir. 1993). A federal court

---

[5]    This approach may be appropriate when analyzing admissibility under the New Mexico constitution. See Sanchez, 811 P.2d at 95. But our inquiry on the admissibility of the statement is governed by the federal constitution, under which this factor is improperly considered.

reviewing a state court determination in a habeas proceeding should not grant relief unless the court finds the trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).[6] To obtain relief for the error, the habeas petitioner must "establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637 (citation omitted). Where a court "is in grave doubt as to the harmlessness of the error . . . the [habeas] petitioner must win." O'Neal v. McAninch, 115 S.Ct. 992, 995 (1995). We examine Miles's statement in light of the entire record to determine the error's possible effect on the jury. Tuttle v. Utah, 57 F.3d 879, 884 (10th Cir. 1995).

---

[6]     Appellant argues that the Brecht/Kotteakos standard governs only if the state courts applied on direct appeal the harmless error test from Chapman v. California, 386 U.S. 18, 24 (1967) (appropriate standard is whether federal constitutional error is "harmless beyond a reasonable doubt"). Because the courts below found no federal constitutional error and therefore did not apply the Chapman test, appellant argues that this court should apply the higher standard of review. Appellant's Br. at 42, n.17; see also Starr v. Lockhart, 23 F.3d 1280, 1292 (8th Cir. 1994) (applying Chapman harmless error standard on collateral review where state court has not reviewed for error); Orndoff v. Lockhart, 998 F.2d 1426, 1430 (8th Cir. 1993) (same). While appellant's position has some merit, we cannot accommodate it. This Circuit has rejected this approach and applies the Brecht/Kotteakos standard regardless of whether the state courts applied harmless error analysis on direct appeal. See Brewer, 51 F.3d at 1529 (rejecting the holding in Starr and applying lesser Kotteakos harmless error review). We note that the Supreme Court has rejected the argument that Confrontation Clause errors merit a higher standard of review than other constitutional trial errors. See Coy v. Alabama, 487 U.S. 1012, 1021 (1988); Van Arnsdall, 475 U.S. at 684 .

Viewing the error in light of the evidence presented at trial as a whole, we find the error harmless. See Wright, 497 U.S. at 823 ("[T]he presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy."). Undoubtedly, Miles's statement was important to the prosecution's case. Independent evidence, however, substantially supported his convictions for conspiracy and as an accomplice to the armed robbery and aggravated battery. The statement was not required to place him in the store at the time of the robbery. At trial, Dale Autry firmly identified Crespin as the male present at the crime scene, in the face of rigorous cross-examination. Autry's description of Crespin's actions and statements during the robbery — urging Miles to hurry up, advising Autry to turn over the money, acting as a possible lookout or supervisor while observing the crime in commission, and leaving the store with Miles once she obtained the money — provides further support for the jury verdict that Crespin was guilty of the crimes charged. When stopped by the police, Crespin lacked a plausible alibi for his presence in the area of the crime scene in the early morning hours. Additionally, several police officers testified to seeing blood on Crespin's arm, hand and clothes at the time of his stop and arrest, and the jury received evidence, in the form of the clothing and photographs, supporting this testimony. In light of the overwhelming evidence

- 19 -

properly presented to the jury, we are confident that the constitutional error did not have a substantial and injurious effect in determining the jury's verdict.

AFFIRM.

97-2046, Crespin v. New Mexico

TACHA, Circuit Judge, concurring

I concur in the judgment but write separately to express my view that the majority misinterprets 28 U.S.C. § 2254(d), which requires us to presume that the factual findings of the New Mexico courts are correct.

The issue before us is whether the admission of Ms. Miles's out-of-court statement to the police violated the defendant's Sixth Amendment rights. As the majority points out, this issue ultimately turns on whether the statement contains "particularized guarantees of trustworthiness" that make it uncommonly worthy of belief. See Lee v. Illinois, 476 U.S. 530, 543 (1986) (discussing Ohio v. Roberts, 448 U.S. 56, 66 (1980)). People are very unlikely to inculpate themselves falsely; therefore, the fact that a statement is against a declarant's penal interests "is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." Williamson v. United States, 512 U.S. 594, 605 (1994).

The state court found that Ms. Miles's statement was against her penal interest and admissible. The majority disagrees and finds a violation of the Confrontation Clause. The majority bases its disagreement with the state court on a point of fact, which the statute obligates us to presume correct, rather than a point of law. I therefore cannot join its reasoning.

In habeas corpus actions, federal courts must give great deference to the factual findings made by state courts. According to the relevant statute, "'a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . shall be presumed to be correct' unless one of eight enumerated circumstances is established." Williamson v. Ward, 110 F.3d 1508, 1513 n.7 (10th Cir. 1997) (quoting 28 U.S.C. § 2254(d)).[1] In habeas corpus appeals, therefore, we must carefully separate factual issues from legal issues, and take issue only with the latter.

Distinguishing between law and fact is always a difficult enterprise, see Pullman-Standard v. Swint, 456 U.S. 273, 288 (1982), and particularly so with regard to whether a statement is against a declarant's penal interest. There are several reasons to call that determination a legal one. To begin with, the Supreme Court has said that factual issues under section 2254(d) are limited to "basic primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." Thompson v. Keohane, 116 S. Ct. 457, 464 (1995) (citations and internal quotation marks omitted). The penal interest question cannot be resolved solely by review of historical facts. To determine

---

[1] The portion of section 2254 applicable here was amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 after Crespin filed his petition for a writ of habeas corpus. Because the statute was passed after Crespin filed his petition, however, the amendments do not apply here. See Nelson v. Walker, 121 F.2d 828, 833 n.4 (2d Cir. 1997) (citing Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997)).

whether a statement is against the declarant's penal interest, courts apply an objective legal standard to pure historical facts: they ask if the statement "'so far tend[s] to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" Williamson, 512 U.S. at 606 (Scalia, J., concurring) (quoting Fed. R. Evid. 804(b)(3)); see also Thompson, 116 S. Ct. at 465 (determining that whether a person is "in custody" is a legal question because it requires court to apply an objective standard to the facts); Earnest v. Dorsey, 87 F.3d 1123, 1131 (10th Cir.) (suggesting that mixed question of law and fact is not entitled to presumption of correctness), cert. denied, 117 S. Ct. 527 (1996). Furthermore, outside the habeas corpus context, courts have found the penal interest question to be a legal one. See, e.g., United States v. Barone, 114 F.3d 1284, 1296 (1st Cir.), cert. denied, 118 S. Ct. 614 (1997); United States v. Costa, 31 F.3d 1073, 1077 (11th Cir. 1994).

A strong case can also be made, however, for classifying the penal interest issue as a factual one for purposes of section 2254(d). At the Supreme Court's own admission, it "has classified as 'factual issues' within § 2254(d)'s compass questions extending beyond the determination of 'what happened.'" Thompson, 116 S. Ct. at 464. When an "issue falls somewhere between a pristine legal standard and a simple historical fact," the distinction at times has turned not on

analysis, but rather on a practical consideration of which judicial actor is better situated to decide the disputed issue. Miller v. Fenton, 474 U.S. 104, 114 (1985). Thompson, the Court's most recent pronouncement on section 2254(d), does not repudiate that approach. Thompson approves of two decisions that classify mixed questions of law and fact -- specifically, a defendant's competency to stand trial and juror impartiality -- as "facts" for purposes of section 2254(d) because the "resolution [of those issues] depends heavily on the trial court's appraisal of witness credibility and demeanor." See Thompson, 116 S. Ct. at 465.

More importantly, Thompson suggests that there is little if any point in classifying a mixed question of law and fact as "law" if *de novo* appellate review of the question will not produce opinions that draw lines and make later decisions easier. See id. at 466 n.14 ("[T]he likely absence of precedential value cuts against requiring plenary appellate review of a district court's determination."). The penal interest question is notoriously resistant to clarifying precedent. It is the kind of question that "can only be determined by viewing it in context," and that is "a fact-intensive inquiry, which . . . require[s] careful examination of all the circumstances surrounding the criminal activity involved." Williamson, 512 U.S. at 603, 604.

Whether the penal interest issue is one of fact -- and therefore entitled to a presumption of correctness -- or law is a close question. The majority reviews it

- 4 -

de novo without discussion.  Even assuming, without conceding, that the majority is correct and the presumption does not attach to the finding on penal interest, however, the majority opinion still fails to observe the commands of section 2254(d).

Regardless of whether a mixed question of law and fact is governed by section 2254(d), it is undisputed that "the questions of fact that underlie [the] ultimate conclusion *are* governed by the statutory presumption." Sumner v. Mata, 455 U.S. 591, 597 (1982) (per curium) (emphasis in original).  In this case, therefore, we must presume that the state court correctly determined issues of historical fact, such as Ms. Miles's reasons for making the statement.  The majority gives no deference to that factual finding.

The majority acknowledges that the state court "set forth the correct legal standard." Maj. Op. at 13.  The operative question was whether the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless she believed it to be true.  See Williamson, 512 U.S. at 603-04.  The majority disagrees with the court's application of the facts to this legal standard, but not for reasons that one could call legal.

Instead, the majority's conclusion hinges on its belief that Ms. Miles did not tell the truth and tried to minimize her role in the robbery:

> In her statement, Miles did not admit to committing the stabbing and claimed she could not remember anything about it; *the clerk's testimony, however, indicates she was the stabber.* Miles also claims that she did not remember demanding money of the store clerk and states that her companion told the clerk to open the cash register. *Yet, according to the clerk's testimony, it was she, the female robber, who demanded money.* She emphasized her drunken state and implied that her accomplices threatened her.

Maj. Op. at 14 (emphasis added). This passage, which forms the basis for the majority's disagreement with the state court, makes a number of conclusions. By contrasting Ms. Miles's statement with the testimony of the clerk, the court concludes that Ms. Miles was the stabber, that she demanded the money from the clerk, that she in fact remembered doing those things at the time she made her statement, and that she chose to hide those facts from the police in order to minimize her role in the robbery.

All of these conclusions are factual in nature -- in fact, they are archetypes of factual questions. Who stabbed the clerk and who demanded money are classic questions of "what happened." More importantly, it is beyond doubt that the credibility of Ms. Miles's statement and her particular reasons for making it are facts. See United States v. Bohl, 25 F.3d 904, 909 (10th Cir. 1994) (describing intent as quintessentially a factual question); Davidson's Estate v. Commissioner, 158 F.2d 239, 243 (10th Cir. 1946) ("The impelling motive in each case is a question of fact . . . ."); Thompson, 116 S.

Ct. at 464 (stating that factual issues are "facts in the sense of a recital of external events *and the credibility of their narrators*") (emphasis added) (citations and internal quotation marks omitted).

The state courts did not make explicit factual findings to the contrary, but that is immaterial. In a habeas appeal, we must presume correct both the explicit *and the implicit* factual findings of the state courts. See Lujan v. Tansy, 2 F.3d 1031, 1035 (10th Cir. 1993). The state court implicitly found that Ms. Miles did not intentionally minimize her role in the crime when she made her statement to the police. If she knowingly concealed the extent of her involvement and emphasized the actions of the others, her statement would not have been genuinely self-inculpatory. Rather, it would be clear to any court that the statement was motivated by a desire to decrease her liability at the expense of her co-defendants. A court could not find such a deceitful statement to possess the required "particularized guarantees of trustworthiness." Lee, 476 U.S. at 543.

The majority intimates that the state courts may not have evaluated the truthfulness of the statement, even implicitly. According to the majority, the state "appeals court looked only to whether Miles's statement subjected her to any liability." Maj. Op. at 14 (emphasis in original). That court, however, did not use an "any liability" test. Instead, it correctly noted that a statement

against interest is one that "so far tended to subject [the declarant] to criminal liability that a reasonable man in his position would not have made the statement unless he believed it to be true." State v. Crespin, No. 13,029, slip op. at 2. This standard does not include statements that attempt to "mitigat[e the declarant's] responsibility for the crimes," Maj. Op. at 16, as the majority characterizes Ms. Miles's confession. Therefore, the majority bases its disagreement with the state court on an implicit factual finding of the state court.

The presumption of correctness in 28 U.S.C. § 2254(d) requires us to accept the state court's contrary finding and therefore find the statement to be one against the declarant's penal interests. That is enough to make the statement admissible under the Confrontation Clause. See Williamson v. United States, 512 U.S. at 605. Thus, I find no constitutional error in this case.

For the reasons outlined above, I respectfully disagree with the majority's analysis and concur in the judgment.